The next case today is United States v. William Gregorio Padilla-Rodriguez, Appeal No. 20-1346. Attorney Padilla-Rodriguez, please introduce yourself for the record and proceed with your argument. Good morning, Your Honors. Attorney Tanaira Padilla-Rodriguez, representing Aetna. I would like to reserve two minutes for rebuttal. Yes. And ask for permission to begin? Yes. Okay, thank you. Appellant has three arguments in this case. The first argument is regarding the exclusion of a canine dog alert evidence. So the facts of this case, the alleged facts of this case, took place on December 28, 2018. They're pretty simple. Appellant traveled in a ferry from the Dominican Republic to Puerto Rico. And there were drugs found inside the engine, the radiator of his car. But the drugs were very well hidden. The radiator was well dimmed. So the defendant did not have any access to the drugs. He could not touch them, see them, reach them, take them out, lift them up, whatsoever. Even one of the x-ray machines were not able to even see the drugs. So because of that particular circumstance, the government needed some additional proof of knowledge of the presence of drugs. And they turned to a treatment incident on December 10 of that same year, a few weeks earlier. On that day, Appellant also traveled from the Dominican Republic to Puerto Rico. And his vehicle was inspected. And during inspections, the officer called the canine unit to inspect the vehicle. And the canine unit, according to the handler, gave an alert for the presence of narcotics. And it's important to see according to the handler, because the handler is the only person in the world that can tell if the dog alerted or not. Nobody else can. He's the only one. So he alerted to the presence of drugs. A search was made, and nothing was found. But the government presented testimony of this handler that established that the dog is never wrong. When the dog gives an alert, narcotics are there or were there. And if nothing is found, it's because they couldn't find it, they were well hidden, or for some reason, or maybe they were moved. But that the alert is always positive. It's right. It's always right. So that was the theory presented to the jury. And that was the theory presented in order for the jury to infer that because of the dog alert, there were narcotics in the vehicle of the defendant that previous day. And because in that day, there were narcotics there, he should have known that on December 28th, narcotics were in his car. So our position is that that evidence should have been excluded because the inference that the government is asking the jury to make is not allowed by the Supreme Court precedent. The Supreme Court in Florida v. Harris has said that a dog alert is sometimes, sometimes enough to provide probable cause for a search. And sometimes it's not even enough to provide probable cause if reliability of the dog is not, if proof of reliability of the dog is not provided. So for the government to ask the jury, based on a dog alert, to infer that they were actually drugged in Mr. Agamonte's car should be not allowed. It's the same thing as the government is not allowed to ask the jury to make a propensity reason under Rule 404, that it's not legally allowed. So it should not be legally allowed to ask the juror to infer something that the Supreme Court has said cannot be inferred from a dog alert. Counselor, I understand your 404 argument. Is it your position that under the circumstances of the December 10th dog sniff when nothing was found, that that was legally for some reason inadmissible? Other than 404, are you saying the court should not have admitted it under some other legal theory? Well, 404 and 403. Forget about 404 and 403 right now. Are you saying, I took from your brief that that was your position is that only if the, only in the instances where the sniff is used to make a finding of reasonable suspicion, that that's the only instance when it's admissible. And because they didn't find drugs here, then it should not have been admitted. Is that your position? Well, no, I am fully aware that a sniff could be admissible in other circumstances, but in other cases, they're admissible, for example, if there was a testimony that drugs were there, and they used maybe the dog said that drugs were there, and there was a testimony saying that. Well, in that case, it could be admissible because it's used to as a foundation for another for another evidence of the presence of drugs. So maybe in that terms, it's okay. But in this case, they're using it as the only evidence of the presence of drugs. Council, that's not quite correct. I mean, the, the evidence of the December 10 incident, the government has a burden of proving knowledge on your client's part, and your defense, I think appropriately, was he was a blind mule, he didn't know, and the government can't prove that he knew. So the government points to this December 10 incident, 18 days prior to the incident involved in this says it's in the same port of entry, it's the same type of car, the dog alert was part of it, the dog alert alerted to the engine itself, and the radiator had fresh paint and non factory welding and was abnormally large. So it's not the sole evidence that the government bring to brought to bear on the December 10 incident. So why wouldn't that accumulative evidence of what happened 18 days prior be appropriate under the rules of evidence? Two reasons. One, the only ever, the only evidence of the presence of drugs that they were drugs there is the dog is the dog because the search did not produce any drugs. And the other reason is that that on the rule 403 or the propensity issue of rule 404, the similarity of these incidents recently in Garcia Sierra discourse said when the incidents are too similar to propensity use is almost, it's almost a given. So, so it because they're way too similar as scenarios, the court should exclude because the danger of the use of the propensity reasoning is is too high that the jury is going to use it. And the other thing is that the reason to use the dog alert was to to ask the jury to think that there were drugs there for sure, even though we didn't find anything. And I think that Florida versus Harris make make clear that that is not evidence of the presence of drugs. That is just evidence for probable cause and only sometimes. So also, the other thing I wanted to talk about, it was the defense attorney was notified with the dog records four days before trial. They asked for a continuous to secure an expert and to be able to see somebody there to say, well, the dog could be wrong, but they were not able to do that. They were not granted a continuous and they were not able to secure an expert. So they were not able to present any testimony to challenge the testimony of the handler. So so that so that the government had made it known that they intended to introduce that evidence. Did you did you try to get an expert even before you they handed you the records? Well, they know they are the defense attorney filed a motion to exclude and the motion was was answered very, very close to trial. But even even if they were not given records before, they said, well, the attorney said that I didn't even have the time to look at the records and make a decision if I needed to secure an expert. So they were I they asked the court to exclude the evidence. And I think they thought that the court was going to exclude this evidence because really, we believe that that it should be clear that a dog alert is no infallible proof of the presence of narcotics. Regarding my second argument, I'm only going to say that the lay witness testimony had nothing to do with the facts or the evidence presented in this case. They talk about the witness talk about drug big drug organizations and packages in the sea. And that had nothing to do with my client or or the evidence presented in this case. The third argument is about the competition hearing. At the beginning of this process, I was counsel. If you could just hit the highlights, we'll give you another minute. Yeah. OK. At the beginning of this process, everyone was evaluated for competency. He was found to be he was found to be intellectually disabled. And he had short term memory difficulty, difficulty to remember. And he needed to be provided close monitoring to his comprehension. At the beginning of the sentencing hearing, the attorney expressed to the judge, I am very wary. I've tried to explain my client this sentencing process and the safety of all that he doesn't understand. And he doesn't understand the consequences of this. Then the judge, she recognized that there was a problem and she started an inquiry. And she asked the client, well, about the percent, the percentage of support and stuff. He did not provide any answers that could lead us to conclude that he understood anything. And the judge made an accusation. And she said, well, I'll try. Oh, I saw you understand the trial and maybe talking to your counsel. And then she proceeded to sentence the client to 10 years of prison and five years of supervisory release. But the problem is that what the attorney presented to the judge was his lack of understanding of that sentencing process, of the safety of all. Not the trial. The trial has already passed. And there was nothing on record that the court could use to determine that he was understanding this. And in U.S. v. Mario, the court has said that the defense attorney is in a privileged position to know if his client is understanding or not these proceedings. So, counsel, summing it up, you're saying that it was erroneous for the court not to delay sentencing and that the court should have ordered another evaluation. Another evaluation and make sure that the client understood the sentencing and the safety of all. Because he clearly did not understand. Thank you. Thank you, counsel. You've reserved some time. If you would mute your device, we'll hear from Ms. Grinnell for the government. Good afternoon, your honors. Andrew Noll on behalf of the United States. I'd like to start, if I may, with the district court's admission of the prior December 10th incident with CBP and Abermonte's related claim about the production of the canine training logs. As to the evidence's admissibility, we focused in our brief in part because of the defendant's presentation on the canine alert portion of that evidence. But as Judge Woodcock pointed out, and as I think is quite clear from pages 78 to 79 of the appendix, we entered the collective set of circumstances of the December 10th incident to show much more than the canine alert. And in particular, we entered it to show the striking similarities between the modifications to the van in terms of the non-factory welding, the fresh paint, and the large oversized nature of the radiator with the separate van that Abermonte drove on December 28th. So if no drugs were detected, is the sniff probative of anything? So, yes, your honor. And just to clarify the record, no drugs were found, but that was because the officers couldn't actually extricate the radiator from the van on December 10th. So we don't actually know. That's what we don't know. We don't know, your honor, but I do think the evidence was still probative. Let me explain briefly why. So this court has held in a number of cases that we cite in our brief, pages 18 to 21, and I point the court most prominently to the Aguidella case, that evidence of a canine sniff can be probative of a common planner scheme, and it can be probative to rebut a claim of innocent involvement. And that's not propensity, because we're not asking the jury to conclude that Abermonte committed a separate crime on December 10th, and therefore he's the type of person who would have committed this separate crime on December 28th. That's exactly what you're saying. No, we're seeking to show a connection, your honor, between the common method that Abermonte used these types of vans to traffic drugs on the ferry from Puerto Rico to the Dominican Republic and back. And I think the close, as I mentioned, the close connection between how the van was modified and the fact that Abermonte was aware of on December 10th, the law enforcement's interest in the van, and then critically five days later gained title to a second van that just so happened to then be modified in the same way, that sort of steps that he took post-December 10th were critically important to the jury's ability to infer his knowledge of the modifications to the van on December 28th. Because contrary to what defense counsel just mentioned, his argument was not, you know, that he, well, she mentioned that the radiator was quite difficult to remove, and his argument at trial was that someone may have planted the drugs during the ferry trip. And I think it's important to note that that would have made some question about why this van was modified and whether someone could have in fact done that during the ferry trip. And so we presented evidence that he'd previously driven a different but strikingly similar van that had the exact same modifications. And so for all those reasons, your honor, I think the collective evidence, including the dog sniff, was sufficient for the jury to infer a common scheme or plan. And if this court thinks that the canine alert portion of the evidence was entered erroneously, we think undoubtedly it was harmless beyond a reasonable doubt because there was substantial additional evidence of Agrimonte's knowledge here. We had the fact that the drugs were 13 kilograms of cocaine, a street value of $300,000. We had testimony that in fact drug trafficking organizations were unlikely to trust that quantity and value of cocaine to an unwitting courier. And we had evidence that we presented about how these vehicles were stored in the ferry between the Dominican Republic and Puerto Rico that really foreclosed any reasonable probability that someone had planted it unwittingly in Agrimonte's car during the voyage. And so for all those reasons, we think both the evidence was entered within the district court's wide discretion and appropriately, but regardless, it was harmless if it was error at all. Let me ask you about the defense request for continuance. At the very end, just prior to trial, the government presented a fair amount of evidence about the canine and the canine sniff. And ordinarily, a defendant would have the ability to go to an expert and challenge that, make a determination as to whether or not your canine was properly qualified, look at the records, and report back to the defense counsel as to whether or not there was an issue here. But they made a motion to continue to get such an expert, and that was denied, effectively denying the ability of the defense to explore the possibility that there might be an issue there. What's your response to whether or not the judge had abused the discretion in forcing trial without the ability of defense counsel to obtain an expert? So let me make two points in response to your question, Judge Woodcock. The first is just as a record matter. This wasn't a voluminous set of evidence. We submitted and provided the certifications for the dogs well before September 30th and then October 4th. The question is the training logs, and those are six single pages that were training logs. You can look at them at pages 10 to 15 of the sealed appendix. And I'd also emphasize, just in terms of timing, it was at the October 11th pretrial conference that the court ordered those logs be produced on October 16th. And at that point, Agramonte's counsel raised no objection, concern about that timing, or even concern about prejudice. And so I think the question is whether the single-day difference made a difference, and he can show that. With respect to the expert, I would think it's critical for the court to understand exactly the argument Agramonte made. And if you look at page 86 of the appendix, he said that he had not yet had a chance to look at the evidence, and he might need to hire an expert. Or, he says, he might conclude that they're irrelevant after looking at them. And I think it's telling that within the eight days following up to and through trial, he never again raised the issue, didn't attempt to use them during cross-examination. And even on appeal, doesn't explain what he might have done with that evidence. And so I just don't think he can show the prejudice that this court has required. In addition, in Perez-Ruiz, this court said a 36-hour period is sufficient time for which a defendant could consult with an expert about evidence. And Agramonte's counsel had more than sufficient time, more than 36 hours, and doesn't explain why he couldn't have at least consulted with an expert. So, again, I would say just the breadth of the evidence and the arguments made didn't support a continuance in this case. I'd also like to briefly turn to the competency issue. And I want to emphasize for the court that the question on appeal is whether the district court abused its discretion in failing to in sua sponte call a competency hearing in the absence of any requests from anyone else at sentencing, in particular, Agramonte's counsel. And I would just make two specific points as to why I don't think that on this record there was reasonable cause for the court to have abused its discretion in failing to call for such a competency hearing. First, I would emphasize that Agramonte's own counsel, although he raised competency concerns or, I'm sorry, you know, capacity concerns related to mitigation, he stated quite clearly on page 713 of the sealed appendix that he had difficulty because he was representing a client who was not so incapacitated as to not be able to stand trial, but had some mitigation issues that he wanted to bring to the court's attention. And this court has explained in Keeney that where a defense counsel is alerted to these issues and makes arguments about them in one capacity, but is not raising a capacity issue is something the court can validly think about and rely on. And I think it's telling that Agramonte's counsel did not make a competency-related argument at sentencing. In addition, there were, we don't doubt, some statements on the record that taken, you know, at face value and perhaps out of context, raised some concern or should have raised some concern for the judge at the outset of the hearing. But the court went on to question Agramonte about his understanding of sentencing and the trial and the plea bargaining, why he didn't plead, why he went to trial. And the court, I think, satisfied itself that he had the legal capacity at sentencing and was not legally incompetent. I would last say with respect to the safety valve issue, there is in the record, and I would look, I would urge the court to look at Agramonte's sentencing memorandum, where he says quite clearly, this is pages 38 and 39 of the sealed appendix, that he fears retaliation out of, he was concerned that if he availed himself of the safety valve, he would face retaliation. And similar to the threat of, the awareness of threats in Keeney, this court mentioned, I think that shows an awareness of what the safety valve would do, that he would receive a reduced sentence. And that is some record evidence that he in fact understood the practical operation of the safety valve. And with respect to whether he needed to understand kind of the legal intricacies of how it worked, this court explained in Brown that the understanding required to be legally competent is understanding of the basics. And I think there was sufficient understanding of the sentencing proceedings, that the court wasn't required in its, to sue a sponte call for a competency hearing. And so I would just respectfully suggest that this record is not one that would require a district court to sue a sponte call for a competency hearing in the absence of such a request from the defendant's counsel. Unless the court has any specific questions on the Fernandez, Agent Fernandez's testimony, we're happy to rest on that issue as explained in our brief. And otherwise we would simply ask that this court affirm the judgment of the district court. Additional questions of Mr. Noll. All right. Thank you. Ms. Padilla. Yes. I just want to address a few issues. One of the issues is in the other cases where the canine sniff is admissible, some drugs are found, or there's some other evidence of the presence of drugs. In this case, no drugs were found, and there's no evidence whatsoever of drugs being present on the December 10 incident. The other thing is that in October 11, the order for the DA to produce the canine records was produced because the DA had failed to produce that before. They already failed to produce it based on some confidentiality argument that was dismissed. So that is why they had a second term, and that's why the defense counsel got those records so late. And even if three pages, two pages, attorneys do not have the expertise to actually know or read exactly what we should read in those records. The other thing I wanted to point out is that the DA wanted the jury to infer that he had committed a crime, that he had drugs on December 10, because in her closing argument she clearly says, Now, the incident about the December 10, that's just a tool, members of the jury, that's just a tool for you to be able to access and look at it reasonably, infer what the defendant intended to do on December 28. That shows that this isn't a mistake, this isn't an accident. This shows that the defendants knew what was happening. This shows that the defendant intended to commit these crimes, or both crimes, rather. So she actually referred to the December 10 as a crime. So she was asking the jury to infer that a drug alert was enough to establish that drugs were there on December 10, and that is extremely prejudicial, and contrary to Supreme Court precedent. Thank you. Thank you very much. That concludes arguments for today. This session of the Honorable United States Court of Appeals is now recessed until the next session of the court. God save the United States of America and this honorable court. Counsel, you may disconnect from the hearing at this time.